1  Robert Marasco (SBN 277661)
   robert.marasco@dinsmore.com
2  DINSMORE & SHOHL, LLP
   655 West Broadway, Suite 800
3  San Diego, CA 92101
   Telephone: (619) 400-0500
4  Facsimile: (619) 400-0501

5  Attorney for Defendant
   BMW OF NORTH AMERICA, LLC
6

7

8              UNITED STATES DISTRICT COURT FOR THE
9                 CENTRAL DISTRICT OF CALIFORNIA
10

11 | KWON CHAE YI,                    | Case No.:  2:17-cv-06467-SVW
12 |         Plaintiff,               |
13 |    vs.                           | **DEFENDANT BMW OF NORTH AMERICA, LLC'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**
14 | BMW OF NORTH AMERICA, LLC;       |
   | and DOES 1 through 10, inclusive,|
15 |                                  |
16 |         Defendants.              | Date:  May 14, 2018
   |                                  | Time: 3:00 p.m.
17 |                                  |
   |                                  | Judge: Hon. Stephen V. Wilson
18 |                                  |
19 |                                  | Action Filed: August 31, 2017
   |                                  | Trial Date: May 15, 2018

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    FACTUAL BACKGROUND AND CONTEXT ....................................1

    A.  BMW NA's Relationship with Dealerships.........................................1

    B.  Dealership Creation and Control of Repair Orders ............................2

    C.  Customer Care Package Is Not A Warranty .......................................3

    D.  Lease and Subsequent Purchase of the Vehicle..................................4

    E.  Filing of the Complaint ......................................................................5

III.   ARGUMENT .........................................................................................6

    A.  Plaintiff Did Not File This Litigation Within The Four-Year Statute Of Limitations. ...................................................................................6

    B.  Plaintiff Has Not Satisfied The Requirements Of The Discovery Rule. ...................................................................................................8

    C.  The Tolling Provisions of § 1795.6 Are Not Satisfied In This Case. 14

    D.  Plaintiff Has Not Satisfied The Class Action Tolling Requirements.15

    E.  Plaintiff Is Ineligible For Tolling Under Any Of The Grounds He Raises Beyond The Scope Of The Court's Instructions. ...................21

        i.    Plaintiff Cannot Avail Himself Of Equitable Tolling. ............21

        ii.   Fraudulent Concealment Is Inapplicable And Did Not Occur In This Matter...............................................................................22

        iii.  Section 1793.1 Does Not Relieve Plaintiff From the Statute of Limitations ...........................................................................23

        iv.   The Customer Care Package Was Not a Warranty Extension.26

        v.    The Implied Warranty Expired In December 2010 And Its Statute of Limitations Expired in December 2014. .................28

VI.    CONCLUSION ....................................................................................29

1

## <u>TABLE OF AUTHORITIES</u>

CASES

*American Pipe Construction Co. v. Utah*
    414 U.S. 538 (1974) .................................................................15, 17, 19

*Appalachian Ins. Co. v. McDonnell Douglas Corp.*
    214 Cal.App.3d 1 (1989)........................................................................22

*Atkinson v Elk Corp of Texas*
    142 Cal App.4th 212 (2006)...................................................................28

*Bang v. BMW of North America, LLC*
    Case No. 2:15-cv-06945-MCA-SCM ................................................18, 19

*Clemens v. DaimlerChrysler Corporation*
    534 F.3d 1017 (9th Cir. 2008)...........................................................17, 19

*Crown, Cork & Seal Company v. Parker*
    462 U.S. 345 (1983) ........................................................................16, 18

*Daugherty v. Am. Honda Motor Co., Inc.*
    144 Cal. App. 4th 824 (2006) ...............................................................13

*Daviton v. Columbia/HCA Healthcare Corp.*
    241 F.3d 1131 (9th Cir. 2001) .............................................................21

*Decoteau v. FCA US, LLC*
    No. 2:15-cv-00020, 2015 U.S. Dist. LEXIS 152579, *8-9 (E.D. Cal. Nov. 10, 2015).........................................................................................12, 25

*Falk v. Children's Hospital Los Angeles*
    237 Cal. App. 4th 1454 (2015)...............................................................20

*Fox v. Ethicon Endo-Surgery*
    35 Cal.4th 797 (2005)............................................................................6

*Glater v. Eli Lilly & Co.*
    712 F.2d 735 (1st Cir. 1983) ................................................................16

*Guiterez v. Mofid*
    39 Cal.3d 892 (1985)..............................................................................9

*Hatfield v. Halifax PLC*
    564 F.3d 1177 (9th Cir. 2009)...............................................................21

*In re Hanford Nuclear Reservation Litigation*
    521 F.3d 1028 (9th Cir. 2008)..........................................................16, 17

*Jensen v. BMW North America, Inc.*
    35 Cal. App. 4th 112 (1995)...................................................................6

*Jolly v. Eli Lilly & Co.*
    44 Cal.3d 1103 (1988)............................................................................9

*McDonald v. Antelope Valley Community College District*
    45 Cal.4th 88 (2008) .............................................................................. 22

*Mexia v. Rinker Boat Co., Inc.*
    174 Cal. App. 4th 1297 (2009) ................................................................. 6

*Neel v. Magana, Olney, Levy, Cathcart & Gelfand*
    6 Cal.3d 176 (1971) ................................................................................. 8

*Nguyen v. Western Digital Corp.*
    229 Cal.App.4th 1522 (2014) .................................................................. 9

*Norgart v. Upjohn Co.*
    21 Cal.4th 383 (1999) .............................................................................. 8

*Sanchez v. South Hoover Hosp.*
    18 Cal.3d 93 (1976) ................................................................................. 9

*Troup v. Toyota Motor Corp.*
    545 Fed. Appx. 668 (9th Cir. 2013) ....................................................... 13

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*
    413 F.3d 553 (6th Cir. 2005) ................................................................. 16

*Yagman v. General Motors*
    No. CV-14-4696, 2014 U.S. Dist. LEXIS 120045 (C.D. Cal. Aug. 22, 2014)
    ........................................................................................................ 12, 25

**STATUTES**

Cal. Code Civ. Proc. § 1791 ........................................................................ 28

Cal. Code Civ. Proc. § 1795.6 ......................................................... 14, 15, 21

Cal. Code Civ. Proc. §§ 1790 *et seq.* ........................................................... 6

Cal. Code Civ. Proc. 1793 ...................................................................... 23, 26

Cal. Com. Code. § 2725 ................................................................................. 6

Code Civ. Proc. § 312 .................................................................................... 6

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**

## I.    INTRODUCTION

Plaintiff has failed, as a matter of law, to satisfy the four-year statute of limitations applicable to this litigation because the warranty expired in April 2011 when Plaintiff reached 50,000 miles on the Vehicle, he did not file his Complaint until August 31, 2017, and none of the tolling provisions he asserts apply to excuse Plaintiff from failing to initiate this litigation sooner.  Moreover, without an expert witness, Plaintiff cannot establish a connection between post-warranty service and his complaints of symptoms during the warranty period, which also precludes him from establishing any of the tolling provisions upon which he attempts to rely.  Similarly, his attempts to allege a defect with the design of the engine with which his Vehicle is equipped is impermissible to invoke the discovery rule as a tolling mechanism because the warranty on his Vehicle applied only to materials and workmanship defects and is not permitted under the law of the Ninth Circuit and California.  As a result, Plaintiff's claims should all be dismissed with prejudice.

## II.    FACTUAL BACKGROUND AND CONTEXT

### A.    BMW NA's Relationship with Dealerships

BMW NA is neither a manufacturer nor a dealer of automobiles; rather, BMW NA serves as an intermediary between those two types of entities by distributing automobiles manufactured by Bayerische Motoren Werke AG ("BMW AG") to dealerships throughout North America.  Declaration of Roger Brown ("Brown Decl.") at ¶ 4.

The dealerships are independently owned and operated and are not the agents of either BMW NA as the distributor or BMW AG as the manufacturer.  Brown Decl. at ¶ 5.  BMW AG and BMW NA maintain a relationship with dealerships in part for purposes of providing maintenance services to BMW

vehicles.  Brown Decl. at ¶ 6.  For example, all new BMW vehicles are covered by a maintenance program that coincides with the express limited warranty that accompanies new BMW vehicles.  Brown Decl. at ¶ 7.  Such a maintenance program is often an optional program with other brands of vehicles, but it is included with the purchase or lease of all BMW vehicles.  Brown Decl. at ¶ 7.  So, when an owner or lessee of a BMW vehicle has a vehicle serviced pursuant to the maintenance program, the labor and parts are supplied by an authorized dealership but they are paid for BMW NA.  Brown Decl. at ¶ 7.  In other words, the dealerships send an invoice to BMW NA for providing the labor and parts and BMW NA pays the dealerships for providing such a service to an owner or lessee of a BMW vehicle.  Brown Decl. at ¶ 7.

This payment system is also followed if the dealership performs services related to work covered under an express limited warranty.  The dealership will send an invoice to BMW NA and BMW NA will pay the dealership for the warranty work done on the covered vehicle.  Brown Decl. at ¶ 8.

### B.    Dealership Creation and Control of Repair Orders

A repair order, commonly referred to as an RO, is a document created by a dealership utilizing a standard software program.  Brown Decl. at ¶ 9.  It is the method for generating an itemization of the service work to be performed on a vehicle, whether because of a request by the customer, a recommendation by a service technician, or a regularly scheduled service visit.  Brown Decl. at ¶ 10.  An RO also serves as an invoice to either the customer or another payor such as BMW NA for work done pursuant to a maintenance program, warranty coverage, or any other program.  Brown Decl. at ¶ 11.  As these documents are created by the independent dealerships, BMW NA does not possess or control the ROs.  Brown Decl. at ¶ 12.  The dealerships do not maintain copies of the ROs indefinitely, as they are often subject to a dealerships document retention policy.  For example, the dealership in this matter, Pacific BMW, from which Plaintiff

leased the Vehicle and other vehicles, has a five-year document retention policy. Brown Decl. at ¶ 13.  As a result, given how long ago Plaintiff's Vehicle was first leased, when requested by the parties the dealership no longer possessed and could not provide copies of the relevant ROs as they had been destroyed pursuant to their document retention policy.  Brown Decl. at ¶ 13.

## C. Customer Care Package Is Not A Warranty

First announced in December 2014, Brown Decl. at ¶ 14, the Customer Care Package ("CCP") is "a complimentary engine care package" offered by BMW NA for vehicles equipped with the N63 engine.  Exhibit 1 at p.1 (SI B00 13 14 – January 2015).  The N63 is a "high performance engine [that is] engineered with EfficientDynamics that provides fuel economy without compromising on its 'class leading' power and performance."  Exhibit 2 at p.1 (SI B11 06 14 – April 2015). BMW NA designed the CCP "[t]o ensure these engines keep delivering the ultimate performance" and "includes a 6 point check, and if necessary, the replacement of one or more of the following powertrain components:

- Hot-Film Air Mass Sensors
- PIEZO High Pressure Fuel Injectors
- Engine Vacuum Pump
- Fuel System Low Pressure Sensor/Feed Line
- Fresh Air Intake Turbo Seals
- Crankcase Ventilation Lines (Hoses)[.]"

*Id.*  The CCP "also includes a multi-point inspection of the vehicle, including tire pressures, fluid levels, safety and convenience features."  *Id.*  The CCP is not a recall or a warranty program, but "a proactive package to update components of the N63 engine that will eliminate potential issues the customers may experience with the vehicle.  Please do not confuse this package with standard warranty repairs."  Exhibit 1 at p.1; *see* Exhibit 2 at p.2.  As a result, it is not a mandatory program and "should only be completed based on parts availability, workshop

capacity, and the customer's schedule."  Exhibit 2 at p.2.  Notably, the CCP included a Customer Loyalty Offer, which "gives the owners of vehicles affected by this Campaign the choice to exchange their current BMW for a new one should they wish to do so, under favorable conditions."  Exhibit 1 at p.4.

In order to ensure the dealerships were paid for any complimentary services they provided to customers pursuant to the CCP, BMW NA instructed that dealerships submit invoices to BMW NA in the same manner they would submit requests for payment for performing warranty covered services.  *See* Exhibit 2 at p.4.  This method of seeking payment for covered services was already in place between BMW NA and the dealerships, and so BMW NA instructed that "[r]eimbursement for this Customer Care Package will be via normal claim entry utilizing" specified codes.  *Id.*  As a result, ROs generated by dealerships for labor and parts provided pursuant to the CCP regularly identified the CCP-related services as warranty work not because it was work covered by an existing warranty but as the manner of indicating the services would be paid for by BMW NA, and not the customer.  Brown Decl. at ¶¶ 16-17.  Additionally, if customers already received and paid for the complimentary work offered in the CCP then the dealership was to inform the customers they were eligible for reimbursement and BMW NA instructed dealerships how to request such reimbursement for the customers.  Exhibit 2 at pp. 5-6.

### D.  Lease and Subsequent Purchase of the Vehicle

Plaintiff leased a 2009 BMW 750Li bearing the vehicle identification number WBAKB85319CY61799 (the "Vehicle") on December 17, 2009.  The Vehicle came with an Express New Vehicle Limited Warranty (the "Express Warranty") effective December 17, 2009 for 48 months or 50,000 miles. Accordingly, the Express Warranty would have expired on December 17, 2013 or when Plaintiff had driven the Vehicle 50,000 miles, whichever occurred first (the "Warranty Period").  The lease was for a period of 36 months and allowed for

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**

60,000 miles of use.  *See* Exhibit 3 (Lease Agreement).  Any mileage accrued over and above that threshold would result in an excessive mileage penalty at the expiration of the lease.  *Id.* (Plaintiff was responsible for paying an excessive mileage penalty of 25 cents per mile for every mile over 60,000 at the expiration of the lease.)  When the lease expired in December of 2012, the Vehicle had approximately 97,485 miles on its odometer.  Thus, during the lease period, Plaintiff exceeded the mileage limitation by more than 37,000 miles.  Under the terms of the lease, Plaintiff would have owed approximately $9,250 for an excessive mileage penalty based upon a payment of 25 cents per mile over the allowance. *Id.*

In this case, Plaintiff achieved 50,000 miles on the Vehicle in April 2011 - a period of approximately 15 months.  At the end of the lease, instead of paying the penalty and returning the Vehicle to the dealership, the Plaintiff purchased the Vehicle in January 2013.  *See* Exhibit 4 (Sales documents).  Plaintiff also purchased an optional service contract for the Vehicle and financed the purchase. *Id.* at p.14.   The total sales price, including fees and finance charges, was $55,569.00 *Id.*  Plaintiff acknowledged that the purchase was made on an "as is" basis.  *Id.* at p.13. (Signed acknowledgment that sale was "AS IS – NO WARRANTY").  Plaintiff still owns and utilizes the Vehicle.  As of July 2017, the month prior to filing the Complaint, the Vehicle had approximately 160,000 miles on its odometer.  The Vehicle now has approximately 166,554 miles.

### E.    Filing of the Complaint

On August 25, 2017, Plaintiff, through counsel, sent a letter to BMW NA demanding that it remedy alleged Lemon Law violations by: (1) taking the Vehicle back and reimbursing all amounts paid without offset, plus interest; (2) reimbursing all incidental and consequential damages; and (3) paying attorney's fees and costs to date.  Six days later, on August 31, 2017, Plaintiff ///

1   brought this motor vehicle Lemon Law action against Defendant pursuant to the

2   Song-Beverly Consumer Warranty Act (Cal. Code Civ. Proc. §§ 1790 *et seq.*).

3   **III.   ARGUMENT**

4   **A.       Plaintiff Did Not File This Litigation Within The Four-**

5   **Year Statute Of Limitations.**

6   Plaintiff has not complied with the four-year statute of limitations

7   applicable to his claims.  While the Song-Beverly Act does not include its own

8   statute of limitations, California courts have held the statute of limitations for an

9   action for breach of warranty under the Song-Beverly Act is governed by the same

10   statute that governs the statute of limitations for warranties arising under the

11   California Commercial Code.  *Jensen v. BMW North America, Inc.*, 35 Cal. App.

12   4th 112, 138 (1995); *Mexia v. Rinker Boat Co., Inc.*, 174 Cal. App. 4th 1297, 1306

13   (2009).  The pertinent provision in the California Commercial Code provides that:

14   (1) An action for breach of any contract for sale must be
    commenced within *four years* after the cause of action

15   has accrued. . .

16   (2) A cause of action accrues when the breach occurs,
    regardless of the aggrieved party's lack of knowledge of

17   the breach.

18   Cal. Com. Code. § 2725 (emphasis added).

19   "A plaintiff must bring a claim within the limitations period after accrual of

20   the cause of action."  *Fox v. Ethicon Endo-Surgery*, 35 Cal.4th 797, 806 (2005)

21   (citing Code Civ. Proc. § 312, "Civil actions, without exception, can only be

22   commenced within the periods prescribed in this title, after the cause of action

23   shall have accrued.").  The Express Warranty expired when the Vehicle reached

24   50,000 miles in April 2011 and any implied warranty expired in December 2010,

25   one year after the lease began.  Plaintiff failed to assert any claims against

26   BMW NA until August 31, 2017, more than six years after the express warranty

27   expired.  Because Plaintiff's claims were not filed within four years of the

28   ///

expiration of the Express Warranty, the claims are time-barred and should be dismissed with prejudice.

In considering the applicability of the statute of limitations to Plaintiff's claims, it is important to emphasize that Plaintiff entered into two completely separate and distinct transactions to obtain possession of the Vehicle. As he has throughout all aspects of this case, Plaintiff treats his history with the Vehicle as if it were a single homogenous event spanning the past eight and half years. However, Plaintiff completely ignores that he entered into two separate and distinct transactions to acquire the Vehicle. First he entered into a lease in 2009 that lasted for thirty-six months. That lease expired in 2012. Following the expiration of the Lease, Plaintiff entered into a completely separate transaction (with new consideration and a separate sales contract from the seller) to purchase the Vehicle.

When Plaintiff purchased the Vehicle, the express warranty was long-expired and he undeniably bought the Vehicle "as is" with no warranty coverage. Thus, nothing about the sales transaction, or the events which followed it, could provide a basis for considering whether Plaintiff timely asserted his breach of warranty claims.

The only question is whether Plaintiff filed suit within the applicable four-year statute of limitations. He did not. Plaintiff should have filed this action for breach of warranty claims within four years of the expiration of the express warranty in April 2011. But, even if the Court were to extend that to the end of Plaintiff's lease in December 2012, when he chose the buy the Vehicle for approximately $55,000 rather than turn it in and pay an over-mileage penalty of $9,250, Plaintiff still failed to file within four years because he did not file this action until August 31, 2017.

Almost everything Plaintiff relies upon to support his untimely claims occurred after Plaintiff entered into a completely separate transaction to purchase

7

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**

1  the Vehicle.  Plaintiff has not cited a single case interpreting the Song-Beverly Act

2  that has recognized a plaintiff may rely upon events which occurred during a post-

3  lease purchase to support their claims.  Even more specifically to the issues

4  addressed in this Brief, Plaintiff has not identified a single case where events

5  which occurred during a post-lease purchase could be relied upon to extend the

6  applicable statute of limitations.

7       The Court should decline Plaintiff's efforts to create new law or stretch the

8  facts to save his untimely claims.  Plaintiff had more than sufficient time to initiate

9  a lawsuit if he felt he had been aggrieved by any alleged breach of warranty.

10 Now, after enjoying and deriving the benefit of over eight years and 160,000 miles

11 of use out of the Vehicle, Plaintiff attempts to impose the harsh remedies of the

12 Song-Beverly Act upon BMW NA.  Because he slept on his rights and filed this

13 lawsuit well beyond the applicable statute of limitations, BMW NA respectfully

14 requests the Court to dismiss his Complaint.

15     **B.     Plaintiff Has Not Satisfied The Requirements Of The**

16         **Discovery Rule.**

17       Plaintiff, in an effort to assert that the discovery rule salvages his untimely

18 claims, ignores clearly governing law, his own testimony, and the undisputed facts

19 of this case.  Further, Plaintiff fails to identify any specific facts that he

20 "discovered" in order to re-invigorate his otherwise inanimate claims.

21       Under California law, an "exception to the general rule of accrual [of the

22 statute of limitations] is the 'discovery rule,' which postpones accrual of a cause

23 of action until the plaintiff discovers, or has reason to discover, the cause of

24 action."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 806, 27 Cal.Rpt.3d

25 661,667 (2005) (citing *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397 (1999); *Neel v.*

26 *Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 187 (1971)).  "A

27 plaintiff has reason to discover a cause of action when he or she 'has reason at

28 least to **suspect** a factual basis for its elements.'"  *Id.* (emphasis added) (quoting

*Norgart*, 21 Cal.4th at 398); *Guiterez v. Mofid*, 39 Cal.3d 892, 897 (1985) ("[T]he uniform California rule is that a limitations period dependent upon discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned the facts essential to his claim."). "Under the discovery rule, **suspicion of** one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." *Id.* (emphasis added) (citing *Norgart*, 21 Cal.4th at 398; *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1112 (1988)).

"'A plaintiff is held to her [or his] actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her [or him].'" *Nguyen v. Western Digital Corp.*, 229 Cal.App.4th 1522, 1551 (2014) (quoting *Jolly*, 44 Cal.3d at 1109) (brackets in original). "'A plaintiff need not be aware of the specific "facts" necessary to establish the claim; that is a process contemplated by pretrial discovery. **Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she [or he] must decide whether to file suit or sit on her [or his] rights. So long as a suspicion exists, it is clear that a plaintiff must go find the facts; she [or he] cannot wait for the facts to find her [or him].**'" *Id.* (quoting *Jolly*, 44 Cal.3d at 1111) (brackets in original) (emphasis added).

"The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put [them] **on inquiry** . . . or if they have . . . **the opportunity to obtain knowledge** from sources open to [their] investigation.'"" *Fox*, 35 Cal.4th at 807-808 (emphasis and brackets in original; internal quotation marks omitted) (quoting *Guiterrez*, 39 Cal.3d at 896-897 (quoting *Sanchez v. South Hoover Hosp.*, 18 Cal.3d 93, 101 (1976))).

///

Plaintiff's own words and actions make clear he had a suspicion of a potential claim from the beginning of his lease, which preceded the filing of his Complaint by well more than four years.  Plaintiff, when asked "when did you first consider filing the lawsuit against BMW?" responded: "From the time I got this car . . . there were a lot of issues."  Exhibit 5 (Excerpts of Deposition of Kwon Chae Yi at 91:14-15, 92:6-7).  Even more fatal to Plaintiff's "discovery" theory was his testimony that he began experiencing the alleged oil consumption issue, which is the primary basis for the claims he asserts in this litigation, approximately a month after acquiring the Vehicle.  Exhibit 5 (Yi depo. at 94:17-19) ("[T]hat problem started occurring less than a month after I got the car . . . .").

And if that were not enough to establish that Plaintiff had a suspicion of a potential claim, Plaintiff's characterization of the Vehicle when he asked to have it repurchased in March of 2017 unequivocally refutes any notion that he "discovered" anything new over the eight years he possessed the Vehicle.  In the Service Request Detail dated March 24, 2017 it plainly says, "C/s [customer states] 2009 750Li[.]  [Customer states] car since bought it has been trouble back to 2010[.]  [Customer states] seems to be always in shop[.]  [Customer states] repeated trouble with engine consuming oil . . . ."  Exhibit 6 at p.1.

Thus, Plaintiff, by his own admission, had at least a suspicion of a potential breach of warranty claim shortly after acquiring the Vehicle.  He had a suspicion well-before the express warranty expired and well-before the lease terminated in 2012 and he purchased the Vehicle.  Nevertheless, by these statements he let more than seven years elapse after acquiring this suspicion before making any effort to initiate legal action.

It also bears emphasizing that Plaintiff has not identified any circumstances with specificity that he claims he "discovered."  He refers generally to large amounts of information, and essentially attempts to throw enough mud against the wall to confuse the issue.  However, applying the legal standard to Plaintiff's own

1    testimony, it is clear he cannot meet the elements necessary to rely upon the

2    "discovery rule."

3           Further, Plaintiff's reliance upon the post-warranty repair history, which has

4    been tenuous throughout these proceedings, becomes even more so now that he

5    has no expert testimony to attempt to tie any post-warranty service activities to

6    circumstances which arose while the warranty was in effect.   Plaintiff simply

7    points to a list of repair visits and opines, with no analysis whatsoever, that it

8    should be a jury question to determine whether those post-warranty concerns are

9    related to those presented while the warranty was in effect.  However, from the

10   face of the repair records, there is absolutely nothing to connect those items.

11   Absent any expert testimony to establish such a link, Plaintiff invites the jury to

12   engage in rampant speculation about whether Plaintiff's complaints of various

13   symptoms equate to actual defects.  Without guidance from expert testimony, a

14   jury would be left in the dark without so much as a matchstick for light to make

15   such findings.

16          Indeed, Plaintiff's list of "oil consumption defect repair visits" highlights

17   the imprecise and speculative nature of Plaintiff's characterizations.   Plaintiff's

18   Brief at pp.5-6.  Many of the "defects" listed for those visits to the dealership

19   included simple oil changes or routine maintenance.  *See* items 4-6, 8, and 10

20   listed under that heading in Plaintiff's Brief.  It is implausible for Plaintiff to

21   suggest it is a "defect" for Plaintiff's Vehicle to require routine maintenance or oil

22   changes.  Further, Plaintiff's list also includes oil leaks which occurred well after

23   100,000 miles had been placed on the Vehicle.   The fact that leaks develop,

24   especially on an old, heavily driven vehicle where parts and components will wear

25   out, does not automatically mean that is the "same" or even a similar concern of

26   complaints which were addressed by topping off the engine's oil.   Only a

27   mechanical expert could establish such a connection, to the extent one exists, and

28   there is no expert to do so in this case.

Case No.:  2:17-cv-06467-SVW

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**

At best, Plaintiff's summary of the repair history would identify symptoms of a potential defect instead of evidence of an actual defect. However, that is insufficient to state a viable breach of warranty claim. *Decoteau v. FCA US, LLC*, No. 2:15-cv-00020, 2015 U.S. Dist. LEXIS 152579, *8-9 (E.D. Cal. Nov. 10, 2015) (noting the distinction between a defect and a mere symptom of a potential defect and holding the latter is not actionable); *see also id.* (citing *Yagman v. General Motors*, No. CV-14-4696, 2014 U.S. Dist. LEXIS 120045 (C.D. Cal. Aug. 22, 2014) ("In *Yagman*, a plaintiff alleged that his vehicle's engine stopped running and experienced a complete electrical shutdown. Testing did not reveal any problems, but the engine eventually broke down again. That court reasoned that injuries caused by a defect, as alleged in the complaint, are different from a defect itself, which was not identified. According to that court, the fact that the vehicle's engine stopped working and that the vehicle experienced a total electrical failure were symptoms of a defect rather than actual defects themselves. More specifically, the fact that the engine failed made it possible that the failure was the result of a defect, but the failure itself did not plausibly lead to the conclusion that a defect was the cause.") (internal citations omitted). That is what Plaintiff has done here, alleged symptoms but not defects and as pointed out above, the lack of expert testimony that could provide a jury a reasonable basis by which to find such a connection between the symptoms and an actual defect is no longer feasible in this case.

Lastly, to the extent Plaintiff is attempting to assert there is something wrong with the N63 engine generally and relies upon some unspecified websites he claims to have seen regarding issues with the N63 engine, they do not provide a viable basis to support his claim that he "discovered" facts to toll the statute of limitations and have no place in this type of litigation. In other words, if Plaintiff is attempting to assert he was recently informed of issues with the N63 engine generally, the type of engine in Plaintiff's Vehicle, that late information would be

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**

related to a purported "design defect," not a defect in workmanship or materials, which is all that was covered by the express warranty in this case. "BMW of North America, LLC (BMW NA) warrants 2009 U.S. specification vehicles distributed by BMW NA or sold through the BMW NA European Delivery Program against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser." Exhibit 7 (excerpt from 2009 BMW 750Li Limited Written Warranty Booklet). The Ninth Circuit has established, based upon California law, that a warranty claim cannot be predicated upon an alleged design defect. *Troup v. Toyota Motor Corp.*, 545 Fed. Appx. 668, 668-669 (9th Cir. 2013) ("The district court properly dismissed the Troups' claim predicated on breach of an express warranty. The Toyota Prius's alleged design defect does not fall within the scope of Toyota's Basic Warranty against 'defects in materials or workmanship.' In California, express warranties covering defects in materials and workmanship exclude defects in design.") (citing *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 830 (2006) ("[Plaintiff] argues . . . that a defect that exists during the warranty period is covered, particularly where it results from an 'inherent design defect,' if the warrantor knew of the defect at the time of the sale. We disagree.")).

In sum, in light of the facts that (i) Plaintiff admitted he believed there were serious issues with the Vehicle within a month of taking possession in December 2009, (ii) he has no expert to connect purported later issues with his complaints of symptoms during the warranty period, and (iii) his only purported recent discovery related to an alleged design defect, which is neither covered by the warranty nor permitted under Ninth Circuit and California law for breach of warranty claims, he has not and cannot establish that he is entitled to the benefits of the discovery rule to toll the statute of limitations. Accordingly, Plaintiff's claims should be dismissed with prejudice.

///

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**

### C.   The Tolling Provisions of § 1795.6 Are Not Satisfied In This Case.

The tolling provisions of California Civil Code § 1795.6 do not avail Plaintiff of any relief from the statute of limitations because there are no facts that satisfy the requirements of this statutory provision.  Even in Plaintiff's Brief on this topic, he does not cite to any actual facts or specific instances that demonstrate he notified the dealership, as the seller of the vehicle, within 60 days of any service that their technicians had failed to remedy a noncomformity.  *See* Plaintiff's Brief at pp. 28-29.

The tolling provisions of § 1795.6(a) and (b) provide:

(a) (1) Except as provided in paragraph (2) warranty period relating to an implied or express warranty accompanying a sale or consignment for sale of consumer goods selling for fifty dollars ($50) or more shall automatically be tolled for the period from the date upon which the buyer either (1) delivers nonconforming goods to the manufacturer or seller for warranty repairs or service or (2), pursuant to subdivision (c) of Section 1793.2 or Section 1793.22, notifies the manufacturer or seller of the nonconformity of the goods up to, and including, the date upon which (1) the repaired or serviced goods are delivered to the buyer, (2) the buyer is notified the goods are repaired or serviced and are available for the buyer's possession or (3) the buyer is notified that repairs or service is completed, if repairs or service is made at the buyer's residence.

(2) With respect to hearing aids, the warranty period shall resume on the date upon which (1) the repaired or serviced hearing aid is delivered to the buyer or (2) five days after the buyer is notified the hearing aid is repaired or serviced and is available for the buyer's possession, whichever is earlier.

(b) Notwithstanding the date or conditions set for the expiration of the warranty period, such warranty period shall not be deemed expired if either or both of the following situations occur: (1) after the buyer has satisfied the requirements of subdivision (a), the warranty repairs or service has not been performed due to delays caused by circumstances beyond the control of the buyer or (2) the warranty

1
2
3
4
5
6

repairs or service performed upon the nonconforming goods did not remedy the nonconformity for which such repairs or service was performed and the buyer notified the manufacturer or seller of this failure within 60 days after the repairs or service was completed. When the warranty repairs or service has been performed so as to remedy the nonconformity, the warranty period shall expire in accordance with its terms, including any extension to the warranty period for warranty repairs or service.

7
8
9
10
11
12
13

Frankly, Plaintiff never before relied upon this statutory section as an applicable basis for the tolling of the statute of limitations.  And now that the Court has inquired of it, Plaintiff confirms that § 1795.6 does not benefit him by failing to identify any facts that meet this section's requirements.  In short, § 1795.6 does not permit tolling of the statute of limitations because the circumstances of this case do not satisfy its elements.   Accordingly, Plaintiff's claims should be dismissed with prejudice.

14
15

### D.    Plaintiff Has Not Satisfied The Class Action Tolling Requirements.

16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff cannot avail himself of the class action tolling doctrine because the class remains intact in the class action upon which he relies and the doctrine requires that the class have been decertified to utilize its tolling benefits.  The class action tolling doctrine, established by the Supreme Court in *American Pipe Construction Co. v. Utah*, 414 U.S. 538 (1974), tolls the statute of limitations for individual claims covered by a putative class action if the class certification is denied.   *Id.* at 554.    In particular, *American Pipe* provides that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties **had the suit been permitted to continue as a class action**." *Id.* (emphasis added).  This is because the purpose of modern class actions is to minimize the amount of litigation, not encourage more. *Am. Pipe*, 414 U.S. at 550 ("A federal class action is no longer 'an invitation to joinder' but a truly representative suit designed to

avoid, rather than encourage, unnecessary filing of repetitious papers and motions."). Although *American Pipe* was decided in the context of individuals intervening in a putative class action suit following the denial of class certification, the subsequent case of *Crown, Cork & Seal Company v. Parker*, 462 U.S. 345 (1983) confirmed that the class action tolling doctrine extended to individuals filing their own separate actions as well as intervenors. *Id.* at 350, 354. In so doing, the Court reiterated the necessity of the ultimate denial of class certification to the applicability of the class action tolling doctrine:

> Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action.

*Id.* at 354.

The Ninth Circuit decided the issue of whether a plaintiff may file an individual suit while class certification is pending and still obtain the benefits of class action tolling where the class was later withdrawn in *In re Hanford Nuclear Reservation Litigation*, 521 F.3d 1028 (9th Cir. 2008). Although some Circuit Courts of Appeals flatly decline to apply class action tolling to individual suits filed during pendency of class certification on the basis that the class has not yet been decertified, *see Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 569 (6th Cir. 2005); *Glater v. Eli Lilly & Co.*, 712 F.2d 735 (1st Cir. 1983), the Ninth Circuit allowed filing of individual suits during class certification pendency, but confirmed that disposal of class certification is a necessary component of the class action tolling doctrine. *In re Hanford*, 521 F.3d at 1052-53. In that case, a plaintiff filed an individual suit for personal injury based on exposure to nuclear radiation in 1997, while class certification in a related class action for nuclear exposure under the Price-Anderson Act, filed in 1990, was pending. *Id.* at 1052. The class action plaintiffs later "withdrew their request for certification" in 2003.

16

Case No.: 2:17-cv-06467-SVW

*Id.*  Plaintiff won at trial, and Defendants appealed the judgment, raising the statute of limitations issue for the first time on appeal.  *Id.* at 1043, 1051.  By the time the Ninth Circuit decided the statute of limitations issue, there was no class pending because of the withdrawal of the certification request.  The Ninth Circuit ultimately held that the class action tolling doctrine applies to plaintiffs filing individual suits "pending class certification."  *Id.* at 1052-53.  Obviously, however, the court applied the doctrine in light of the fact that the class action plaintiffs had withdrawn their class certification, satisfying the class certification denial requirement of *American Pipe* and *Crown.*  *See id.*; *American Pipe*, 414 U.S. at 554; *Crown*, 462 U.S. at 354.  Although *In re Hanford* adjusted when an individual plaintiff may file his or her individual suit and still take advantage of the class action tolling doctrine, it did not alter the original rules of *American Pipe* and *Crown*, which both require that the class certification be denied to activate the tolling doctrine.

This reading of *Hanford* is bolstered by the later-decided Ninth Circuit case of *Clemens v. DaimlerChrysler Corporation*, 534 F.3d 1017 (9th Cir. 2008), which was issued two months after *Hanford*.  In *Clemens*, the Ninth Circuit confirmed its view that under *American Pipe* the class action tolling doctrine requires a denial of class certification:

> In some instances, a plaintiff can rely on the filing of a prior class action to vindicate the right in question and toll the statute **in the event that the class is not ultimately certified**.

*Id.* at 1025 (citing *Am. Pipe*, 414 U.S. at 554) (emphasis added).  This formulation of the *American Pipe* rule confirms that the Ninth Circuit requires a denial of class certification.

A more recent district court case within the Ninth Circuit, *Adamov v. PricewaterhouseCoopers, LLP*, No. CIV S-13-1222 LKK/AC, 2013 U.S. Dist. LEXIS 153091 (E.D. Cal. Oct. 22, 2013), also confirms the necessity of a class certification denial.  In *Adamov*, plaintiff brought a putative class action against

17

defendant PricewaterhouseCoopers ("PwC") asserting the class of "Attest Associates" employed by PwC after July 23, 2008. *Id.* at *1, *6. Plaintiff's putative class was to cover "everyone shut out of" an earlier class action, *Campbell v. PwC*, where the putative class was all Attest Associates employed by PwC prior to July 23, 2008. *Id.* at *6. Plaintiff argued that he was entitled to the protections of class action tolling based on the earlier class action case, *Campbell*, but the court rejected this argument and explained that class certification denial is necessary to the application of the doctrine:

> Plaintiff's reliance on *Crown* is misplaced. First, *Crown* applies only to "asserted members of the class." The *Campbell* class does not include anyone whose claim arises after "the time when class notice was given," July 23, 2008.
>
> Second, plaintiff's reading of *Crown* is grossly overbroad. *Crown* was a case where class certification was denied, and accordingly it made sense to toll the limitations period up until that time. But it does not state or imply that the limitations period is tolled in all cases until class certification is denied – even cases were class certification is **never** denied.

*Id.* at *7-8 (emphasis in original). This also recognizes the true purpose of the *American Pipe* rule – to minimize litigation. *Am. Pipe*, 414 U.S. at 550 ("A federal class action is no longer 'an invitation to joinder' but a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.").

In the case before this Court, Plaintiff claims he benefits from the class action tolling doctrine based upon the case *Bang v. BMW of North America, LLC*, Case No. 2:15-cv-06945-MCA-SCM, currently pending in the United States District Court for the District of New Jersey, but does not assert that he qualifies because the class has been decertified. Indeed, he cannot because the class in *Bang* is still intact and has been approved. The most recent docket entry in *Bang*, from 3 days ago on May 11, 2018, is for an "ORDER granting parties <u>87</u> Motion

for Settlement, etc. Signed by Judge Madeline Cox Arleo on 5/10/2018. (sm) (Entered: 05/11/2018)," which followed a "MOTION for Settlement *Unopposed Motion for Preliminary Approval of Class Action Settlement* by All Plaintiffs," on May 4, 2018, indicating not only that the class certification has not been denied, but the class is still intact, unopposed, and the class settlement has been accepted. *See* Exhibit 8 (*Bang* Docket) (also indicating a Final Approval Hearing has been set for September 10, 2018).  Under the plain authority of *American Pipe* and *Crown*, because the class in *Bang* is still intact, and class certification actually has been approved and not denied, Plaintiff is not entitled to the benefit of the class action tolling doctrine.  *See American Pipe*, 414 U.S. at 554; *Crown*, 462 U.S. at 354; *Clemens*, 534 F.3d at 1025.

Notwithstanding Plaintiff's hyperbolic assertion that BMW NA "egregiously misstated the law" with regard to class action tolling, *see* Plaintiff's Brief at p.22, it should now be evident that it is Plaintiff who has ignored and failed to cite the applicable and controlling caselaw to this Court.  Plaintiff only cites California state authorities, or unpublished district court cases citing California caselaw and failed to alert the Court to this class settlement in *Bang*. *Id.*  Nonetheless, regardless of whether California or federal authorities are applied, the class action tolling doctrine still requires that the putative class is ended before tolling applies.[1]

---

[1] *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103 (1988) and *Falk v. Children's Hosp. Los Angeles*, 237 Cal. App. 4th 1454, 1464 (2015) both dealt with *state* court class actions being used to toll subsequent *state* court actions.  These authorities suggest that California class action tolling authorities apply when a plaintiff seeks to take advantage of an earlier *state* class action, while federal authorities apply if a plaintiff seeks to take advantage of an earlier *federal* class action.  *See Clemens*, 534 F.3d at 1025 ("The rule of *American Pipe* . . . allows tolling within the federal court system in federal question class action.").  Plaintiff has also attempted to further muddy the waters as to whether state or federal class action tolling applies by asserting federal question jurisdiction *and* diversity jurisdiction, while suddenly now electing to "not . . . pursu[e]" its sole federal

1       Plaintiff's interpretation of *Falk v. Children's Hospital Los Angeles*, 237
2    Cal.App.4th 1454, 1464 (2015) glosses over the clear requirements of that
3    decision.   In *Falk*, the prior putative class state class action (Palazollo) ended
4    when defendants succeeded on a motion for summary judgment against
5    Palazollo's individual claims.   *Id.* at 1465.   Palazollo tried to preserve the class
6    action claims, but failed, which "left [class members] without an action to pursue
7    their claims" and ripe for tolling under *American Pipe*.   *Id.*   Accordingly, because
8    the court in *Falk* held that class action tolling "lasts from the day a class claim is
9    asserted until the day the suit is conclusively not a class action," *id.* at 1464, it
10   permitted the tolling.   *Id.* at 1465.   Although the court in Palazollo's class action
11   did not ultimately rule on class certification, the putative class died when
12   Palazollo had his claims dismissed and failed to preserve the class claims.

13       Here, although Plaintiff emphasizes that *Bang* did not conclude by denial of
14   class certification, Plaintiff's Brief at p.22, Plaintiff has not met the requirement of
15   *Falk* because the *Bang* case has not ceased to be a class action.   On the contrary,
16   *Bang* is still a class action, and based upon that court's most recent order, will
17   settle as a class action.   *See* Exhibit 8 (*Bang* Docket).   Accordingly, even
18   assuming *arguendo* that *Falk* applies, which requires the absence of a class,
19   Plaintiff's claims are not subject to class action tolling because *Bang* resolved as a
20   class action.   Accordingly, Plaintiff's claims cannot benefit from the class action
21   tolling doctrine and should be dismissed with prejudice.

22   ///

23   ///

24

25   claim for violations of the Magnuson-Moss warranty act.  Plaintiff's Brief at p.1.
26   This appears to be a self-serving attempt to confuse the Court into applying what
     Plaintiff seems to consider the more favorable California state authorities.
27   However, as discussed *infra*, regardless of what authorities apply, Plaintiff is still
28   barred from the benefits of the class action tolling doctrine because the class
     action upon which he relies remains intact.

**E.     Plaintiff Is Ineligible For Tolling Under Any Of The Grounds He Raises Beyond The Scope Of The Court's Instructions.**

**i.     Plaintiff Cannot Avail Himself Of Equitable Tolling.**

The purpose of the statute of limitations is to prevent the litigation of stale claims by providing defendants with notice in time to prepare a fair defense on the merits and to require plaintiffs to diligently pursue their claims. *Daviton v. Columbia/HCA Healthcare Corp.,* 241 F.3d 1131, 1137 (9th Cir. 2001) (*en banc*). "Equitable tolling is a judge-made doctrine" under California law, which operates "to suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness." *Lantz v. Centex Homes*, 31 Cal.4th 363, 370 (2003).

In California courts, equitable tolling has been applied to avoid the injustice of dismissing what would otherwise be a time-barred claim when three factors are met: (1) timely notice to the defendant in the filing of the first claim; (2) lack of prejudice to the defendant in gathering evidence to defend against the second claim; and (3) good faith and reasonable conduct by the plaintiff in filing the second claim. *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1188-89 (9th Cir. 2009).

Without conceding the first two requirements and only addressing the third, Plaintiff's reliance on equitable tolling fails because Plaintiff did not act reasonably or in good faith.  The warranty on Plaintiff's Vehicle ended when he reached 50,000 miles in April 2011.  During his deposition he testified that he believed there were problems with the Vehicle within the first month of the lease, which began December 17, 2009.  That admitted belief required Plaintiff to file his breach of warranty claims by January 2014 – four years from the end of the first month of his lease. Thus, even though Plaintiff testified that he had a suspicion of issues with the Vehicle from when he first leased the vehicle in 2009,

he waited until August 31, 2017, to file the instant action. This failure to comply with the appropriate statute of limitations is not reasonable, good faith conduct. Therefore, Plaintiff fails to fulfill the third requirement of the equitable tolling doctrine.

Moreover, as explained above with respect to the class action tolling doctrine, Plaintiff's reliance on a class action to toll the statute of limitations where the class remains intact and therefore fails to fulfill the requirements of *American Pipe* and its progeny that the class must have been disbanded, is also unreasonable. Plaintiff has not proceeded with this action in good faith where the class action tolling doctrine has not been fulfilled, and for this reason as well, the third requirement of the equitable tolling doctrine has not been met.

Furthermore, the equitable tolling doctrine was designed to prevent unjust and technical forfeitures of the right to a trial on the merits. *McDonald v. Antelope Valley Community College District*, 45 Cal.4th 88, 99 (2008) (quoting *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal.App.3d 1 (1989)). Any forfeiture of the right to trial on the merits would not be unjust because it would be the result of Plaintiff's own unreasonable actions. Plaintiff sat on his claims instead of acting reasonably and filing his claims within the applicable statute of limitations. Accordingly, Plaintiff's claims should be dismissed with prejudice.

### ii.    Fraudulent Concealment Is Inapplicable And Did Not Occur In This Matter.

Plaintiff attempts to assert a basis to toll the statute of limitations that this Court has already rejected when the Court dismissed Plaintiff's fraud claim originally pled as the Sixth Cause of Action of his Complaint. For the same reasons the Court dismissed Plaintiff's fraud claim, Plaintiff has not, and cannot, show fraudulent concealment by BMW NA. As discussed above, BMW NA is neither a manufacturer nor a dealer of automobiles. Rather, BMW NA serves as

22

an intermediary between the manufacturer (BMW AG) and dealerships throughout North America – neither of which are a party to this litigation.

Throughout this case, Plaintiff has not pointed to a single affirmative misrepresentation or concealment made by BMW NA; rather, at best, Plaintiff only complains of alleged conduct by the dealership. Indeed, on the eve of trial, Plaintiff's only "support" of its claim of fraudulent concealment against BMW NA comes from paragraphs 60, 62, 64a, and 65 of his Complaint, Plaintiff's Brief at pp.25-26, which all fall within his Seventh Cause of Action for an alleged violation of the Consumer Legal Remedies Act and which Plaintiff declared he is no longer pursuing. Plaintiff's Brief at p.1 ("As a preliminary matter, to simplify matters for purposes of trial, Plaintiff will not be pursuing his Magnuson-Moss Warranty Act and Consumer Legal Remedies ("CLRA") claims."). Accordingly, Plaintiff's unsupported claim that BMW NA's "fraudulent concealment also tolled Plaintiff's claims" is without merit and should be dismissed by the Court.

### iii.   Section 1793.1 Does Not Relieve Plaintiff From the Statute of Limitations

Plaintiff has yet to identify a defect that existed during the warranty period. Instead, he slaps the "defect" label on two normal characteristics of the Vehicle and hopes the Court will be fooled into believing their mislabeling. At best, Plaintiff's complaints of excessive oil consumption and rough riding could be considered a symptom of a defect, but not a defect itself. And the lack of either a natural connection to an actual defect or expert testimony that would allow a jury to make the connection between the symptoms and a defect prevents Plaintiff from invoking § 1793.1 as a means to toll the statute of limitations.

Section 1793.1 provides that "[i]f a defect exists within the warranty period, the warranty will not expire until the defect has been fixed." Cal. Civ. Code § 1793.1(a)(2). Relying on this statute Plaintiff attempts to rely on the mislabeled

1   "oil consumption defect" as a basis for arguing there was a defect that was never

2   fixed by BMW NA and so the statute of limitations should be tolled.  Plaintiff's

3   Brief at pp.26-27.  Plaintiff's claim is without merit because there was no defect,

4   he fails to even allege an actual defect, and he conflates the symptoms of a defect

5   with an actual defect, which had no later manifestations into an actual defect.

6           During the warranty period the Vehicle was presented to Pacific BMW on

7   four occasions with a concern the low Oil light being illuminated.  Two of those

8   occasions were for the normally scheduled oil change service, so such service

9   visits should not be considered a visit to address a problem – all vehicles require

10  regularly scheduled oil changes.  Also, it should not be lost on the Court that the

11  50,000 mile warranty period was compacted into 15 months – instead of the

12  average 48 months – due the numerous miles Plaintiff was putting on the Vehicle

13  on a daily basis.  Based on the mileage when the engine needed to be topped with

14  oil, the rate of oil consumption did not exceed the BMW specifications of

15  750 miles per quart and an oil change service every 15,000 miles.  Indeed, during

16  the warranty period Plaintiff drove 12,171 miles before needing the first oil top

17  off; he then drove another 4,854 miles before he brought in the Vehicle for the

18  first scheduled oil change at 17,025 total miles; he then drove 8,381 miles before

19  the second top off; and finally he drove another 5,372 miles before needing the

20  second scheduled oil service at 30,778 total miles.  There is then no recorded oil

21  top offs before he has his third scheduled oil service at 47,326 miles.  As a result,

22  there is no evidence that would suggest to an objective person that there was a

23  defect because the Vehicle was consuming oil in the manner in which the Vehicle

24  was designed and as a result of the conditions under which it was driven by

25  Plaintiff.  Accordingly, there was no defect in workmanship or material related to

26  oil consumption that justified a warrantable repair at any of these visits.

27          Any effort to equate normal oil consumption by an engine with oil leaks, as

28  Plaintiff attempts to do, is misguided and should not be trusted.  An oil leak during

the warranty period inherently suggests the engine system has a fault because it is not sealed.  Conversely, an engine's normal consumption of oil which is hastened by the harsh driving conditions under which it is operated indicates the engine is operating as it was designed.  As the Vehicle was consuming oil in accordance with its specifications and consistently under the circumstances of its operation, there was no defect to remedy.  Nor was the oil consumption a symptom of any defect; indeed, Plaintiff has yet to identity the defect that had excessive oil consumption as its symptom.  *See Decoteau v. FCA US, LLC*, No. 2:15-cv-00020, 2015 U.S. Dist. LEXIS 152579, *8-9 (E.D. Cal. Nov. 10, 2015) (noting the distinction between a defect and a mere symptom of a potential defect and holding the latter is not actionable); see also id. (citing *Yagman v. General Motors*, No. CV-14-4696, 2014 U.S. Dist. LEXIS 120045 (C.D. Cal. Aug. 22, 2014) ("In *Yagman*, a plaintiff alleged that his vehicle's engine stopped running and experienced a complete electrical shutdown.  Testing did not reveal any problems, but the engine eventually broke down again.  That court reasoned that injuries caused by a defect, as alleged in the complaint, are different from a defect itself, which was not identified.  According to that court, the fact that the vehicle's engine stopped working and that the vehicle experienced a total electrical failure were symptoms of a defect rather than actual defects themselves.  More specifically, the fact that the engine failed made it possible that the failure was the result of a defect, but the failure itself did not plausibly lead to the conclusion that a defect was the cause.") (internal citations omitted).  That is what Plaintiff has done here, alleged symptoms but not defects, and because there is no natural connection between a symptom and an alleged defect, expert testimony is required.  The lack of expert testimony that could provide a jury a reasonable basis by which to find such a connection between the symptoms and an actual defect is no longer possible in this case and therefore Plaintiff cannot establish there is a

///

1    defect that was not remedied and so cannot rely upon § 1793.1 to toll the statute of
2    limitations.

3    Additionally, if Plaintiff is attempting to allege there is a design defect with
4    the engine in his Vehicle, he cannot do so by way of breach of warranty claims.
5    *Troup v. Toyota Motor Corp.*, 545 Fed. Appx. 668, 668-669 (9th Cir. 2013) ("The
6    district court properly dismissed the Troups' claim predicated on breach of an
7    express warranty.  The Toyota Prius's alleged design defect does not fall within
8    the scope of Toyota's Basic Warranty against 'defects in materials or
9    workmanship.'  In California, express warranties covering defects in materials and
10   workmanship exclude defects in design.") (citing *Daugherty v. Am. Honda Motor
11   Co., Inc.*, 144 Cal. App. 4th 824, 830 (2006) ("[Plaintiff] argues . . . that a defect
12   that exists during the warranty period is covered, particularly where it results from
13   an 'inherent design defect,' if the warrantor knew of the defect at the time of the
14   sale. We disagree.")).

15   Plaintiffs cannot point to a single defect that arose during the warranty
16   period that was not remediated, to the extent anything that arose needed
17   remediation.   Accordingly, Plaintiff cannot avail himself of the provisions of
18   § 1793.1 to toll the statute of limitations and his claims should be dismissed with
19   prejudice.

20              **iv.    The Customer Care Package Was Not a**
21                       **Warranty Extension.**

22   It is well established that the Customer Care Package ("CCP") was "a
23   complimentary engine care package" offered by BMW NA for vehicles equipped
24   with the N63 engine.  Exhibit 1 at p.1; Brown Decl. at ¶ 14.  It was designed for
25   cars containing this engine to assure that BMW customers continued to receive
26   ultimate performance from their vehicles.  The CCP is not a recall or a warranty
27   program, but "a proactive package to update components of the N63 engine that
28   will eliminate potential issues the customers may experience with the vehicle.

Please do not confuse this package with standard warranty repairs." Exhibit 1 at p.1; *see* Exhibit 2 at p.2; Brown Decl. at ¶ 14. As a result, it is not a mandatory program and "should only be completed based on parts availability, workshop capacity, and the customer's schedule." Exhibit 2 at p.2; Brown Decl. at ¶ 14. As part of a goodwill initiative, dealerships were authorized by BMW NA to perform a 6-point check on vehicles with the N63 engine. Exhibit 2 at p.1; Brown Decl. at ¶ 14. The dealerships were also authorized by BMW NA to replace one or more specific powertrain components at no charge to the customer. Importantly, the CCP included a Customer Loyalty Offer, which "gives the owners of vehicles affected by this Campaign the choice to exchange their current BMW for a new one should they wish to do so, under favorable conditions." Exhibit 1 at p.4; Brown Decl. at ¶ 15. This was not a warranty, nor an extension of a warranty, and was performed regardless of the status of any warranty on a customer's vehicle.

Indeed, when the CCP came out in December 2014, Plaintiff had already leased/owned his car for 6 years, during which time he had driven it more than 130,000 miles. Nonetheless, because it was equipped with the N63 engine, when Plaintiff brought his car in for service on February 5, 2015, Pacific BMW performed the upgrades provided for by the CCP on his Vehicle. This resulted in various components being replaced under the active goodwill program. What Plaintiff fails to mention in any briefing is that on this day, the car he now claims is a lemon had 131,687 miles on it. Exhibit 9 (Feb. 5, 2015 RO). Importantly, Plaintiff could have simply requested a new BMW vehicle pursuant to the Customer Loyalty Offer – and still can do so; instead, he kept the Vehicle, drove the Vehicle for another 30,000 miles, and then claimed it was a "lemon," asked for BMW NA to buy it back in 2017, and initiated this lawsuit.

After completing the CCP upgrades on the Vehicle, Pacific BMW stamped the repair order as "warranty" and submitted it to BMW NA for payment. *Id.* As

1   Mr. Webber testified at his deposition, a "warranty" stamp on a repair order did
2   <u>not</u> indicate that that the car was "under warranty." *Accord* Brown Decl. at ¶¶ 16-
3   17.  Rather, it was how service providers identified the services that were to be
4   paid for by BMW NA and not the customer.  Exhibit 10 (Excerpt of Deposition of
5   Ron Webber, 29:1-23); Brown Decl. at ¶¶ 16-17.   In fact, although non-
6   warrantable services falling under the CCP goodwill program were run through
7   the warranty department, they were ultimately paid for through a different
8   account.  Exhibit 10 (Webber Dep. 44:2-10)

9       Contrary to Plaintiff's unsupported assumptions otherwise, this method of
10   generating invoices was only to ensure the dealerships received payment for the
11   complimentary services they provided to customers pursuant to the CCP that
12   BMW NA offered.  *See* Exhibit 2 at p.4; Brown Decl. at ¶¶ 16-17.  Because the
13   CCP was not an extension of any warranty, Plaintiff's claims fall outside the
14   statute of limitations and his claims should be dismissed with prejudice.

15       **v.    The Implied Warranty Expired In December**
16           **2010 And Its Statute of Limitations Expired in**
17           **December 2014.**

18       Plaintiff failed to timely assert a claim for breach of implied warranty
19   because he did not file his Complaint within four years of the expiration of the
20   implied warranty.  Civil Code § 1791.1(c) sets the parameters for the duration of
21   an implied warranty – it "shall be coextensive in duration with an express
22   warranty which accompanies the consumer goods, provided the duration of the
23   express warranty is reasonable; but in no event shall such implied warranty have a
24   duration of less than 60 days nor more than one year following the sale of new
25   consumer goods to a retail buyer."   Thereafter, the consumer has four years to
26   initiate a claim alleging breach of implied warranty pursuant to applicable statute
27   of limitations.  *Atkinson v Elk Corp of Texas*, 142 Cal App.4th 212, 229 (2006)
28   (citing Cal. Civ. Code § 2725).  Notably, Plaintiff relies on *Mexia v. Rinker Boat*

*Co., Inc.*, 174 Cal. App. 4th 1297 (2009) for the proposition that an action can be later initiated if it falls outside of the limitations period.   The *Mexia* case, however, draws no such conclusion; in fact, the court permitted plaintiff's suit there because it was filed within the statute of limitations.   "[T]he earliest date the implied warranty of merchantability regarding Mexia's boat could have accrued was the date Mexia purchased it – April 12, 2003.   Because he filed this action three years seven months after that date, he did so within the four-year limitations period.   Therefore, Mexia's action is not barred by a statute of limitations." *Id.* at 1306.

Under the circumstances presented here, plaintiff leased the Vehicle on December 17, 2009.   The duration of the implied warranty period was for as long as the express warranty period lasted and for not more than one year; so, the implied warranty period ended December 17, 2010.   To preserve his claims for breach of an implied warranty, Plaintiff is required to have filed an action within four years, in this case that limitations period expired December 17, 2014.   Instead, he filed his Complaint on August 31, 2017, long after the applicable limitations period expired.   Accordingly, Plaintiff's claims should be dismissed with prejudice.

## VI.   CONCLUSION

For the foregoing reasons, BMW NA respectfully requests the Court to dismiss with prejudice all of Plaintiff's claims against BMW NA.

DATED:  May 14, 2018                    DINSMORE & SHOHL LLP


By:*/s/ Robert G. Marasco*
Robert G. Marasco
Attorney for Defendant
BMW OF NORTH AMERICA, LLC

1

**CERTIFICATE OF SERVICE**

2          I certify that on the date specified below, this document filed through the

3   ECF system was sent electronically to the registered participants as identified on

4   the Notice of Electronic Filing.

5

6   Dated: May 14, 2018                              */s/ Robert G. Marasco*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BMW NA'S MEMORANDUM ADDRESSING PLAINTIFF'S FAILURE TO SATISFY THE STATUTE OF LIMITATIONS**